IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 19-cr-00507-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

**JOSHUA DAVID GESS,**

    Defendant.

---

### UNITED STATES' RESPONSE TO DEFENDANT'S
### MOTION TO RECONSIDER PRETRIAL DETENTION ORDER

---

    The United States of America hereby responds to defendant's Motion to Reconsider Pretrial Detention Order Pursuant to 18 U.S.C. § 3142(f)(2) and (i) (doc. 152), filed April 22, 2020, together with the supplement to the motion (doc. 174), filed June 16, 2020.

    The defendant argues that there is new material information to justify reopening detention, citing the pandemic itself, his personal risk from it, positive cases at FDC Englewood, other medical problems, the superseding indictment, and the fact that there is no longer a state parole hold request with the U.S. Marshal Service. However, none of this information is material to the question at issue for detention—whether any conditions of release can reasonably assure the appearance of the defendant and the safety of others in the community. Neither do these reasons constitute compelling reasons for temporary release under 18 U.S.C. §3142(i). Most importantly, detention is proper because a consideration of the factors set forth in 18 U.S.C. § 3142(g) show that

1

continued detention is the only way reasonably to assure the defendant's appearance and the safety of the community. Accordingly, the United States respectfully requests that the Court deny the defendant's motion, without the need for a hearing on the matter.

## BACKGROUND

The defendant was indicted on December 5, 2019. He was charged with three counts: being a felon in possession of a firearm contrary to 18 U.S.C. § 922(g)(1); possessing with intent to distribute 50 grams of a mixture containing methamphetamine contrary to 21 U.S.C. § 841(a)(1) and (b)(1)(B); and possession of a firearm in furtherance of a drug trafficking crime contrary to 18 U.S.C. § 924(c)(1)(A)(i). (Doc. 1.) At his detention hearing this Court found that no conditions existed that could reasonably assure the defendant's appearance or the safety of the community. (Doc. 11.) A superseding indictment was returned on January 23, 2020, with the sole difference from the first indictment being a change from 50 grams of mixture to 5 grams of pure methamphetamine, under the same subsection. (Doc. 86.) On January 29, 2020, the defendant filed a notice of disposition, which is still pending. (Doc. 110.)

## ARGUMENT

**I.    The defendant has not established new material information to justify reopening the issue of detention.**

### A.    Legal Standard

A detention hearing may be reopened "if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any

other person and the community." 18 U.S.C. § 3142(f). Reconsideration of a detention order is permissible "*only* when there is new information that would materially influence the judgment about whether there are conditions of release which will reasonably assure that the defendant will not flee and poses no danger to any other person or the community." *United States v. Cisneros*, 328 F.3d 610, 614 (10th Cir. 2003) (emphasis added).

### B. New information related to COVID-19 is not material.

Neither the current pandemic, nor any particular risk factors of the defendant, are material to the issue of detention, and therefore are not a proper basis for reopening detention. "A defendant's concerns that he is facing heightened COVID-19 risks while incarcerated do not typically factor into a § 3142(f) analysis because the risk of harm *to the defendant* does not usually bear on whether the court can fashion conditions of release that will reasonably assure that the defendant is not a risk of nonappearance or a risk of harm to any others or the community." *United States v. Calvert*, 2020 WL 1847754, at *2 (D.Kan. April 13, 2020) (citing *United States v. Clark*, 2020 WL 1446895, at *3 (D.Kan. March 25, 2020)); *see also United States v. Bracey*, 2020 WL 1809187, at *3 (D.Minn. April 9, 2020) (denying motion to reopen detention under § 3142(f) based on defendant's COVID-19 concerns); *United States v. Hanson*, 2020 WL 1685912, at *2 (D.Mont. April 7, 2020) (same); *United States v. Graham*, 2020 WL 1685912, at *5 (D.Minn. April 7, 2020) (same); *United States v. Knight*, 2020 WL 1676959, at *5 (D.Nev. April 6, 2020) (same).

Even if such risks to the defendant were material, the defendant has not established any significance of those risks, or that they would be mitigated by release.

### *i.*     *The Bureau of Prisons has instituted procedures to mitigate the risks of COVID-19*

BOP has taken aggressive steps to protect inmates' health and to keep COVID-19 out of its facilities. "[M]aintaining safety and security of BOP institutions is [BOP's] highest priority." Updates to BOP COVID-19 Action Plan: Inmate Movement (March 19, 2020), *available at* https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

BOP has longstanding procedures for managing the threat of infectious disease, including protocols relevant to a variety of potential infections and pandemics. *See*, *e.g.*, BOP Program Statement No. 6190.04, Infectious Disease Management (June 3, 2014), *available at* https://www.bop.gov/policy/progstat/6190_004.pdf; BOP Health Services Division, Pandemic Influenza Plan (October 2012), *available at* https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf.

BOP began planning for COVID-19 in January 2020, when it began developing policies in consultation with the Centers for Disease Control. *See* BOP COVID-19 Action Plan: Agency-Wide Modified Operations (March 13, 2020) ("BOP Action Plan"), *available at* https://www.bop.gov/resources/news/20200313_covid-19.jsp; *see generally* BOP COVID-19 Coronavirus (updated regularly), *available at* https://www.bop.gov/coronavirus/index.jsp.

In mid-March, BOP implemented an action plan to "mitigate the spread of COVID-19" in prisons, for the protection of both inmates and staff. *See* BOP Action Plan. Screening procedures are in place, visits have been restricted, and inmate movement is being reduced to help limit possible exposure in BOP facilities. *Id*. Individual facilities have adopted "modified operations," including staggered meal and recreation times, to promote social distancing. *Id*.

4

### ii. *BOP procedures at FDC Englewood have been and continue to be effective in protecting inmates from COVID-19.*

In the defendant's supplement, he cites information from the USMS that there are four inmates at FDC Englewood who have tested positive for COVID-19, in order to support his original contention that "the disease reaching the FDC is a matter of when, not if." (Doc. 152 at 4.) However, no outbreak has taken place. According to USMS information, the four inmates who tested positive where recent transportees from other states, and pursuant to protocol were immediately isolated and tested when they arrived at FDC Englewood. Since their positive tests, they continue to be quarantined. During the last few months of pandemic, the Englewood complex has had only one other positive test, in a staff member.

The defendant does not provide any reasons for why he expects to be more safe from COVID-19 in public, where risks of infection remain significant, than at FDC Englewood.

### iii. *The defendant fails to demonstrate any elevated personal risk.*

The defendant also fails to provide any basis for the Court to find that he is at greater risk from COVID-19 than any other prisoners or the populace as a whole. While he discusses various medical problems, he only argues that his asthma presents a risk, and concedes that the others are "not a COVID-19 risk factor." To support the idea that asthma places the defendant at particularly high risk from COVID-19, he refers to early guidance from the CDC which states simply that "People with moderate to severe asthma may be at higher risk of getting very sick from COVID-19." *See People Who Need to Take Extra Precautions*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last

5

visited June 19, 2020). However, according to some research, there does not appear to be evidence that asthma in fact increases risk from COVID-19,[1] and there are even some early studies that indicate allergic asthma may in fact reduce the risk from COVID-19.[2] Most notably, the American Academy of Allergy, Asthma and Immunology provides the following information on its public website:

> The coronavirus disease 2019 (COVID-19) pandemic is scary for all people, but for those with asthma there is great fear that they will have a worse outcome or be more likely to get SARS-CoV-2 (the virus that causes COVID-19). It is important to know that currently there is no evidence of increased infection rates in those with asthma. And although the Centers for Disease Control and Prevention states that patients with moderate-severe asthma could be at greater risk for more severe disease, there are no published data to support this determination at this time. There has been one report suggesting that asthma may increase the risk of hospitalization from COVID-19 in 18-49 year old adults; however, this is based on a small number of patients. [] And in the opposite direction are data from New York where asthma was under-represented (so protective) in those who died from COVID-19. [] It is important to remember we are dealing with an evolving pandemic and new information could change the situation in the future. . . . It is worth noting that there are seasonal versions of coronaviruses that have been shown to cause asthma exacerbations. The SARS-CoV-2 virus (like SARS-CoV and MERS-CoV, the two other pandemic coronaviruses) does not seem to cause asthma exacerbations.

AMERICAN ACADEMY OF ALLERGY, ASTHMA AND IMMUNOLOGY, *COVID-19 and Asthma: What Patients Need to Know*, https://www.aaaai.org/conditions-and-treatments/library/asthma-library/covid-asthma (citations omitted) (last visited June 19, 2020). Accordingly, since the defendant has cited nothing more than the CDC

---

[1] *See* David M. G. Halpin, Rosa Faner, Oriol Sibila, Joan Ramon Badia, and Alvar Agusti, *Do chronic respiratory diseases or their treatment affect the risk of SARS-CoV-2 invection*, LANCET RESPIRATORY MEDICINE (April 3, 2020), https://www.thelancet.com/action/showPdf?pii=S2213-2600%2820%2930167-3
[2] *See* Gian Galassi, *Asthma May Have Protective Mechanism in COVID-19*, UNIVERSITY OF WISCONSIN-MADISON SCHOOL OF MEDICINE AND PUBLIC HEALTH, https://www.med.wisc.edu/news-and-events/2020/april/allergies-asthma-may-reduce-covid-19-risk-/ (reporting results of a study published on April 22, 2020, in the Journal of Allergy and Clinical Immunology).

cautionary recommendations, he has not brought forward any sufficient basis for this Court to conclude he is at any higher risk from COVID-19 than anyone else in the general population.

### C. The defendant's other new information is not material.

#### i. Other medical condition

The defendant further argues that his other medical concerns are new information that warrants reopening of detention. As to the other medical concerns, the defendant argues that a recommended colonoscopy has not been performed. Despite his contention that he is "not being treated by the BOP" (doc. 174 at 1), it appears that the colonoscopy is a precautionary follow-up to a previous procedure, not treatment for an ongoing medical condition. Additionally, that procedure was rescheduled in order to ensure the defendant's *safety* from COVID-19, further evidence of the extreme caution and care that BOP is taking to ensure his and other detainees' safety. Though the defendant cites one medical note saying that the colonoscopy was urgent, he also indicates that the more recent decision to delay the procedure was made because of a medical determination that it was in fact not urgent. Regardless, the medical condition and delay in performing a colonoscopy are not relevant facts to whether the defendant is a risk of non-appearance or a danger to the community, and thus are not material.

#### ii. Lifting of state parole hold

Likewise, the existence of a state parole hold may have informed the defendant's original decision of whether to contest detention, but the fact that it has been lifted is irrelevant to the question of whether the defendant would pose a risk of non-appearance or danger to the community. Such a hold would at best show some futility in contesting

7

detention, as it would indicate the state's intention to take the defendant into custody. But without such a hold, the detention analysis remains identical, and therefore this information is not material, and not a proper basis for reopening detention.

### iii. Superseding Indictment

The defendant points out that the United States obtained a superseding indictment after forensic testing confirmed that one of the substances thought to contain methamphetamine actually comprised a methamphetamine cutting agent called dimethyl sulfone.  Dimethyl sulfone is a chemical sometimes used as a topical treatment for animals such as horses, and available at farm supply stores, with no other common licit uses.  However, it is the most common cutting agent used by drug dealers for cutting methamphetamine, because it closely resembles methamphetamine.  A cutting agent is added to pure methamphetamine in order to increase its volume, and thereby increase its value in street-level transactions.  In other words, while the forensic testing revealed that the defendant possessed less pure methamphetamine than previously believed, it showed that he intended to cut the methamphetamine in order to distribute a lower purity mixture to others, thus increasing the strength of the evidence against him. Further, the superseding indictment contains precisely the same statutory penalties as the original indictment, including the existence of the statutory presumption of detention, and thus nothing changed regarding the Court's factual finding of the lengthy sentence faced by the defendant.  Therefore, the new information is not material to detention, and therefore not a basis for reopening detention.

## II.  Even were there new material information, the defendant should be detained under 18 U.S.C. § 3142.

### A.  Legal Standard

The Court "shall order the detention" of the defendant pending trial if the Court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1).

Because the defendant is charged by Indictment with a violation of federal drug trafficking laws with a maximum prison term of ten years or more, and a violation of 18 U.S.C. § 924(c), a presumption arises that no condition or combination of conditions will reasonably assure the appearance of the Defendant and the safety of the community. 18 U.S.C. § 3142(e)(3)(A) and (B).  Once the presumption is invoked, "the burden of production shifts to the defendant." *United States v. Holguin*, 791 F.Supp.2d 1082, 1088 (D. N.M. 2011).  The burden of persuasion regarding risk-of-flight and danger to the community remains with the Government.  *United States v. Stricklin*, 932 F.2d 1353, 1354–55 (10th Cir. 1991).  While a defendant's burden of production is not heavy, "some evidence must be produced." *United States v. Villapudua-Quintero,* 308 F. App'x 272, 273 (10th Cir. 2009).

The Government's burden to show that there is no condition or combination of conditions will reasonably assure the safety of any other person and the community is "by clear and convincing evidence." 18 U.S.C. § 3142(f)(2).  As for risk of flight, the Government's burden is preponderance of the evidence.  *United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003). In making that determination, the Court shall consider the following factors: (1) the nature and circumstances of the offense charged;

(2) the weight of the evidence against the Defendant; (3) the history and characteristics of the Defendant; and (4) the nature and seriousness of the danger to any person or the community. 18 U.S.C. § 3142(g).

**B.    Detention is necessary reasonable to ensure the appearance of the defendant and the safety of the community.**

The defendant offers no evidence to rebut the presumption of detention. His arguments relate primarily to reasons why he wants to be released. His only assertions regarding his risk of non-appearance and danger are a groundless assertion that the presence of COVID-19 in the community makes him less of a flight risk or danger; that he has been sober since being taken into custody; and that he does not have recent violent convictions. However, none of these facts have any affirmative force to carry the defendant's burden of production.

In fact, though the defendant characterizes it as "flight risk," the real standard is risk of non-appearance. The defendant's previous track record, which he does not rebut, contains no less than twenty failures to appear, along with two failures to pay fines, and three prior parole revocations. Additionally, the defendant was on parole when he committed the crimes that are the subject of the current prosecution. Accordingly, the defendant has shown that he has a long history of non-appearance and non-compliance with ordered conditions.

With regard to danger to the community, while the defendant may not have recent convictions for assaults or other violent conduct, the instant case involves two firearms in the defendant's room, close by his drug dealing materials, both loaded and with rounds in the chamber ready to fire. Further, drug dealing poses a significant danger to the community. "Danger to the community encompasses the danger that a

defendant will continue to engage in felony drug trafficking activity." *United States v. Kelsey*, 82 F. App'x 652, 653 (10th Cir. 2003) (unpublished) (citing *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir.1989)).  The defendant has a long history of both drug dealing and drug using.  While he has undergone the forced sobriety of detention, he offers nothing else to show that he would not resume his drug-related activities were he to be released.  Instead, his record shows that even when under parole supervision the defendant violates his conditions, conceals his activities from his supervising officers, and engages in drug-related conduct.  Therefore he is a danger to the community.  With regard to his likelihood of conviction, he currently has a notice of disposition filed.  The current charges impose a ten-year mandatory minimum prison sentence.

Accordingly, no conditions or combination of conditions of release could reasonably assure the defendant's appearance, or provide for the safety of the community.

## III. The defendant has not established compelling reasons for purposes of 18 U.S.C. § 3142(i).

Title 18 U.S.C. § 3142(i) states, in part, that "[t]he judicial officer may, by subsequent order, permit the temporary release of the person . . . to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."  Such relief is reserved for "extraordinary circumstances."  *See United States v. Rebolla-Andino*, 312 Fed. App'x 346, 348 (1st Cir. 2009).  The defendant bears the burden to show a "compelling reason" for temporary release.  *See United States v. Dupree*, 833 F.Supp.2d 241, 246 (E.D.N.Y. 2011); *see also United States v. Jeffries*, 2011 WL 182867 at *4 (E.D.Tenn. Jan. 20,

11

2011); *United States v. Birbragher*, 2008 WL 2246913 at *1-2 (N.D.Iowa May 28, 2008). "The standard imposed by the statute is one of necessity, not convenience." *United States v. Reese*, 2012 WL 13081673 at *1 (D.N.M. 2012).

Cases construing § 3142(i) generally "have rejected emergency motions for release of otherwise healthy and potentially violent defendants based solely on the generalized risks that COVID-19 admittedly creates for all members of our society." *United States v. Lee*, No. 19-CR-298 (KBJ), 2020 WL 1541049, at *6 (D.D.C. Mar. 30, 2020) (citing *United States v. Cox*, No. 19-cr-271, 2020 WL 1491180 (D. Nev. Mar. 27, 2020)); *United States v. Green*, No. 19-cr-304, 2020 WL 1477679 (M.D. Fla. Mar. 26, 2020); *United States v. Steward*, No. 20-cr-52, 2020 WL 1468005 (S.D.N.Y. Mar. 26, 2020); *United States v. Hamilton*, No. 19-cr-54, 2020 WL 1323036 (E.D.N.Y. Mar. 20, 2020); *see also United States v. Clark*, No. 19-40068-01-HLT, 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020). As the Third Circuit observed, "We do not mean to minimize the risks that COVID-19 poses in the . . . prison system, particularly for inmates. . . . But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify . . . release." *United States of America v. Raia*, No. 20-1033, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020).

Although the defendant invokes Section 3142(i), which only authorizes "temporary release," he is essentially seeking pretrial release under another avenue. To put the defendant's stated reasons into perspective, in two published decisions, federal courts identified occasions when an otherwise "dangerous" defendant's medical condition constituted a "compelling reason" meriting release from pretrial detention. The instant case is factually distinguishable from these earlier decisions, and highlight the

extreme medical situations which could potentially justify release under subsection i.  In *United States v. Scarpa*, 815 F.Supp. 88 (E.D.N.Y. 1993), the court released on bail a terminally ill defendant, who had been ordered detained prior to trial, on condition he be confined at a hospital under 24-hour guard by the U.S. Marshal's Service.  The defendant was in the final stages of AIDS, partially blind, suffering from infections, experiencing AIDS-related dementia, and expected to live no more than one to two months. 815 F.Supp. at 90.  Vital to the court's determination was its finding that the staff of the Metropolitan Correctional Center (MCC), where the defendant was in pretrial detention, could not "despite their best intentions and efforts, humanely care for defendant's needs." *Id.* at 92.

In *United States v. Cordero Caraballo*, 185 F.Supp.2d 143 (D.P.R. 2002), the court placed a gravely wounded defendant on 24-hour house arrest at either a medical facility or his grandmother's residence.  The defendant sustained "serious" and "grotesque" gunshot wounds, suffered a heart attack, underwent an emergency tracheotomy, was partially paralyzed, could not use his left hand, and had open and infected wounds. 185 F.Supp.2d at 144.  Finding "the Bureau of Prisons [could not] provide the necessary medical care defendant require[d]," the court authorized pretrial release under the restrictive conditions specified in its order.  *Id.* at 146.  The court emphasized its decision was "limited to the extraordinary facts of this case, and, in the future, should not be considered carte blanche by any injured or ailing defendant as a basis for arguing his or her pretrial release." *Id.*

Essential to both courts' determinations was their finding that the jails could not offer adequate care for gravely infirm or terminal pretrial detainees.  Unlike Scarpa and

13

Cordero Caraballo, the defendant is not presently suffering from a health condition (certainly not a grave or terminal condition) that the BOP is incapable of treating. Unlike Scarpa and Cordero Caraballo, the defendant does not suffer from an incapacitating condition, which undoubtedly also influenced the Scarpa and Cordero Caraballo courts' decisions. As the Cordero Caraballo court noted, a finding that a defendant was a danger to the community "is premised on the assumption that the defendant be mobile enough to roam in the community. However, [due to Cordero Caraballo's medical condition], such is not the case here." *Cordero Caraballo*, 185 F.Supp.2d at 145. Thus, the incapacitating effects of Scarpa and Cordero Caraballo's conditions mitigated their dangerousness enough to permit their pretrial release. Yet, despite Scarpa and Cordero Caraballo's extreme incapacity, the courts remained concerned about their dangerousness and nonetheless imposed severe restrictions on their freedom. In Scarpa's case, the court directed the U.S. Marshal's Service to post a guard outside his hospital room for 24 hours per day. *Scarpa*, 815 F.Supp. at 93. In Cordero Caraballo's case, the court directed the defendant remain under 24-hour house arrest. *Cordero Caraballo*, 185 F.Supp.2d at 146. The defendant does not possess Scarpa or Cordero Caraballo's extreme incapacity and is certainly "mobile enough to roam the community" if released. *See id.* at 145. The defendant, therefore, remains an uncompromised danger to the community, which cannot be adequately mitigated by lesser forms of restraint, like electronic monitoring.

  **III.**  **No evidentiary hearing is necessary.**

  Generally, a court need not hold an evidentiary hearing on a motion unless the factual allegations are "sufficiently definite, specific, detailed, and non-conjectural" that

there is actually a contested issue of material fact.  *United States v. Chavez-Marquez*, 66 F.3d 259, 261 (10th Cir. 1995) (citation omitted).  Nor is a hearing required when the motion fails as a matter of law.  *Id.*  The United States respectfully requests that the defendant's motion be denied on the pleadings.

## CONCLUSION

Accordingly, the United States respectfully requests that the Court deny the defendant's motion.


Submitted this 19th day of June, 2020.

                                      JASON R. DUNN
                                      United States Attorney

By:   */s/ Garreth Winstead*
        GARRETH WINSTEAD
        Assistant United States Attorney
        1801 California St., Suite 1600
        Denver, Colorado 80202
        Phone:  (303) 454-0100
        Fax:  (303) 454-0405
        E-mail:  garreth.winstead@usdoj.gov
        Attorney for the United States

**CERTIFICATE OF SERVICE**

I hereby certify that on June 19, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the parties on record.

*s/ E. Garreth Winstead*
E. GARRETH WINSTEAD
Assistant United States Attorney